## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**RALPH L BRESHEARS**                                                                 **PLAINTIFF**

**v.**                                **Case No. 4:18-cv-00774-LPR**

**CITY OF LITTLE ROCK,** *et. al.*                                        **DEFENDANTS**

## SUMMARY JUDGMENT ORDER

On August 1, 2018, Ralph L. Breshears, a former Little Rock Police Officer, filed a Complaint in the Eastern District of Arkansas.[1]  On October 19, 2018, Officer Breshears initiated a separate related action in the same district and division.[2]  The parties filed a Joint Motion to Consolidate the two cases.[3]  On April 26, 2019, the Court granted the Motion to Consolidate and declared Officer Breshears's second action as the lead case for purposes of docketing and scheduling.[4]

On September 10, 2019, Officer Breshears filed an Amended Complaint.[5]  He sues the City of Little Rock and Kenton Buckner individually and in his official capacity (collectively, the "Defendants") for discrimination and retaliation under Title VII of the Civil Rights Act of 1964, for fraud under Arkansas law, and for numerous other state torts.[6]  On December 6, 2019,

---

[1]  Pl.'s Compl. (Doc. 1) Case No. 4:18-cv-00501-LPR.  Almost all of the events relevant to this action occurred while Plaintiff was an Officer in the Little Rock Police Department.  Accordingly, the Court will refer to Plaintiff as Officer Breshears, even when discussing events that took place after he left the police force.

[2]  Pl.'s Compl. (Doc. 1) Case No. 4:18-cv-00774-LPR.

[3]  Joint Mot. to Consolidate (Doc. 14) Case No. 4:18-cv-00501-LPR.

[4]  Order to Consolidate (Doc. 16) Case No. 4:18-cv-00501-LPR; Order to Consolidate (Doc. 9) Case No. 4:18-cv-00774-LPR.  All further citations to the docket relate to Case No. 4:18-cv-00774-LPR.

[5]  Pl.'s Am. Compl. (Doc. 14).

[6]  *Id.* ¶¶ 13-31.

Defendants filed this Motion for Summary Judgment.[7]  For the following reasons, Defendants'
Motion for Summary Judgment is GRANTED in its entirety.

## I.  Background

On  summary  judgment,  the  Court  views  the  facts  in  the  light  most  favorable  to  the
nonmoving party and affords him all reasonable inferences.[8]  This background section is based
mostly on undisputed facts.  When a fact is disputed, the Court adopts the version of the disputed
fact that is most favorable to Officer Breshears.  Accordingly, the facts set forth in this background
section are only applicable in the context of summary judgment and do not necessarily represent
what a jury would find at trial.

The Little Rock Police Department ("LRPD") hired Officer Breshears in February of
1991.[9]  Over the course of his career, Officer Breshears worked as a member of the Accident
Reconstruction Department, as a negotiator for the LRPD's Hostage Negotiation Team, and in
other various capacities.[10]  During the period of time relevant to this case, Officer Breshears was
working as a Field Training Officer.[11]  In this capacity, Officer Breshears held the rank of a
patrolman.  His responsibilities included working patrol and training rookie officers.[12]  Officer
Breshears also served as the Chief negotiator for the LRPD's Hostage Negotiation Team on an as-

---

[7]  Defs.' Mot. for Summ. J. (Doc. 28).  Defendants originally filed a Motion for Summary Judgment on November
20, 2019.  *See* Defs.' First Mot. for Summ. J. (Doc. 18).  The Court determined that the first Motion was deficient
and instructed Defendants to refile a corrected motion.  *See* Am. Order (Doc. 24).

[8]  *Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1115 (8th Cir. 2018).

[9]  Pl.'s Statement of Undisputed Facts (Doc. 34) ¶ 1.

[10]  *Id.* ¶¶ 3-4; *see also* Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 19-20 (21:22-27:11).

[11]  Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 20 (27:22-28:7).

[12]  *Id.*

needed basis.[13]   And he had his own civil accident reconstruction business.[14]

In 2016, the LRPD's Special Operations Division posted a vacancy in its Hit-and-Run Unit.[15]   The position was only advertised and available to internal applicants pursuant to the LRPD's General Order on "Transfer and Assignment Requests" (General Order 202).[16]   Officer Breshears applied to fill the vacancy.

### A.   The Characteristics of the Hit-and-Run Position

As the name suggests, a Hit-and-Run officer's primary role is to investigate hit and run accidents.[17]   But, perhaps because it is part of the Special Operations Division, the Hit-and-Run Unit is also tasked with managing the LRPD's School Crossing Guard Program, managing the LRPD's utility vehicles, and organizing and overseeing the LRPD's involvement in special events and dignitary escorts.[18]   Although the Hit-and-Run position did not constitute a promotion in the traditional sense—the successful applicant's rank and pay would not change—Officer Breshears perceived the job as more desirable than the position he held at that time.[19]   Specifically, he asserts that the Hit-and-Run position offered a take-home vehicle, a better avenue for climbing the LRPD's ranks, and more opportunities to work off-duty.[20]

---

[13]  Pl.'s Statement of Undisputed Facts (Doc. 34) ¶ 4; Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 29:19-30:8.

[14]  Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 17 (15:5-22).

[15]  Ex. 2 (Transfer Memo) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 11.

[16]  *Id.*; *see also* Ex. 1 (General Order 202) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 2-4 (202-1-202-3).

[17]  Ex. 2 (Transfer Memo) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 11.

[18]  *Id.*

[19]  Pl.'s Statement of Undisputed Facts (Doc. 34) ¶¶ 5-6; Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶¶ 4-5; Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 22 (36:8-19); Ex. 7 (Salaam Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 270-71 (88:20-89:3).

[20]  Pl.'s Statement of Undisputed Facts (Doc. 34) ¶ 6; Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 1.

The record is largely undeveloped with respect to the potential for a take-home vehicle. Presumably, the vehicle's primary function would have been driving to and from work and work-related events.[21]  The record is devoid of any evidence revealing the benefit that would have been derived from having a take-home vehicle (as opposed to checking out a department vehicle when on the job).[22]  The record does not reveal how much money Officer Breshears would have saved on gas, maintenance, or insurance had he received a take-home vehicle.  Nor does it present any figures relating to the depreciation of Officer Breshears's personal vehicle.

At the summary judgment hearing, the Court asked Officer Breshears's counsel what benefit would be derived from a take-home vehicle.  Officer Breshears's counsel explained that the benefit would have been monetary.[23]  "It's the gas, it's the insurance, it's the maintenance, its not having to take your own vehicle to work as he was doing . . . . The city's paying for all of that."[24]  When asked a similar question, Defendants' counsel estimated that it could cost the City anywhere from two to six thousand dollars a year to fuel a take-home vehicle.[25]  But none of this information was contained in the record.  And the arguments advanced at the hearing do not constitute evidence.  Moreover, the estimate made by Defendants' counsel included all fuel expenses, not just the fuel used driving to and from work.[26]  It is only this latter amount that could be meaningful, since all officers get their gas paid for when using department vehicles on the job.

---

[21] According to Officer Salaam's deposition, he did not use his take-home vehicle for personal reasons, and it was not claimed on his taxes. Ex. 7 (Salaam Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 265 (83:10-22).  The record reveals that Officer Breshears lived in Maumelle and that he was driving his personal vehicle when responding to hostage negotiation calls. Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 21 (31:2-14).

[22] May 20, 2020 Hr'g Tr. at 10:24-11:5.

[23] *Id.* at 54:25-55:5.

[24] *Id.* at 55:6-9.

[25] *Id.* at 8:25-9:24.

[26] *Id.* at 9:17-21.

There is likewise no evidence in the record that could lead a rational jury to find that the Hit-and-Run position would have propelled Officer Breshears to new heights in the LRPD. In fact, to the extent there is evidence in the record on this point, it suggests that promotion in rank is impossible without passing a standardized exam, regardless of an officer's job-title.[27] Not surprisingly, Officer Breshears's counsel walked this argument back at the summary judgment hearing. He instead asserted that the Hit-and-Run position would have elevated Officer Breshears's status, rather than his rank.[28] He explained that, as part of the LRPD's Special Operations Division, the Hit-and-Run position carried the prestige and honor associated with a "special ops" designation.[29] He implied that this elevation in status could indirectly help with advancement if Officer Breshears ever passed the standardized exam.[30] But once again, there is no evidence in the record to support these assertions.

Of the three perceived benefits, the potential for off-duty work is the most significant.[31] Generally, off-duty work consists of work performed as an officer, but outside of the officer's usual LRPD responsibilities. For example, off-duty work might include working security "at a church" or for "Walmart or Dillard's."[32] When an officer engages in this kind of work, the officer is paid (whether directly or indirectly) by the contracting entity.[33] Depending on the nature and

---

[27] Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 30 (65:15-66:8); Ex. 5 (Washington Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 24 (22:4-23); *see also* May 20, 2020 Hr'g Tr. at 56:11-57:2. Officer Breshears was a police officer for nearly 27 years. He took and failed the Sergeant's exam twice. *See* Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 30 (65:15-66:8).

[28] *Compare* Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 1, *with* May 20, 2020 Hr'g Tr. at 57:3-58:7.

[29] May 20, 2020 Hr'g Tr. at 57:3-58:4.

[30] *Id.*

[31] *Id.* at 58:5-10.

[32] Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 23 (38:18-20).

[33] May 20, 2020 Hr'g Tr. at 15:20-16:16, 59:24-61:1, 63:18-64:21; *see also* Ex. 7 (Salaam Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 257-58 (75:19-76:14).

duration of the work, this additional pay can be significant.[34]

Off-duty work can easily be confused with special events, which, as noted above, are an integral part of a Hit-and-Run officer's job.[35]  Occasionally, a special event can be classified as an off-duty assignment.[36]  But more often than not, special events are paid as overtime.[37]  The distinction lies with the hosting entity.  When a special event is hosted by the City of Little Rock, the event is paid as overtime.[38]  When a special event is hosted by an entity other than the City of Little Rock, the event constitutes off-duty work and is paid (directly or indirectly) by the contracting party.[39]  This minor overlap between special events and off-duty assignments is not the benefit that Officer Breshears is referring to when he says that the Hit-and-Run position affords more "opportunities for off-duty."[40]  Indeed, special events are typically large enough to require department-wide participation.[41]  Thus, officers outside of the Hit-and-Run Unit have little to no trouble working special events.  In fact, Officer Breshears plainly testified that he worked every

---

[34]  According to Officer Breshears's counsel, a Hit-and-Run Officer "would have the ability to work off-duty as much or as little as he wanted." May 20, 2020 Hr'g Tr. at 60:25-61:1.  But Defendants' counsel stated that all officers, including Hit-and-Run officers, are capped at a maximum of 20 hours of off-duty work a week. *See id.* at 18:15-20.  There is no record evidence one way or the other on this point.

[35]  As part of the "Special Operations Division," Hit-and-Run officers are tasked with running special events in the City. Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 23-24 (39:21-42:13), 25 (48:9-12); Ex. 4 (Whitten Dep.) to Defs.' Mot. for Summ. J. (Doc 28-1) at 87 (38:14-39:1); Ex. 7 (Salaam Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 258 (76:4-7).  Examples of these events include marathons, block parties, public assemblies, and other major events. Ex. 2 (Transfer Memo) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 11.

[36]  May 20, 2020 Hr'g Tr. at 60:10-20, 64:5-21, 67:1-3.

[37]  *Id.*

[38]  *Id.* at 64:7-9.

[39]  *Id.* at 15:20-16:16, 59:19-60:21, 64:7-12; *see also* Ex. 7 (Salaam Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 257-58 (75:19-76:14).

[40]  Pl.'s Statement of Undisputed Facts (Doc. 34) ¶ 6.

[41]  At the hearing, Officer Breshears's counsel explained that special events typically needed "every police officer on board because they were such huge events that many of the police force had to volunteer, were assigned or said I'm volunteering for some overtime. They'd require the majority of the police force." May 20, 2020 Hr'g Tr. at 65:5-10.  He further explained that "[a] lot more availability was there during special events because it was something more than two or three officers monitoring a parking lot, it was hundreds of officers lining the streets to protect Little Rock." *Id.* at 67:23-68:1.

event the city has ever hosted.[42]

In light of the foregoing, the best understanding of Officer Breshears's argument is that the Hit-and-Run position affords more "opportunities for off-duty" because officers in the Special Operations Division are entitled to the first shot at any off-duty assignment.[43]   Unlike special events, off-duty assignments are limited in availability.[44]   Thus, while any officer can volunteer to work off-duty, an off-duty assignment only becomes available to officers outside of the Special Operations Division when a "special ops" officer does not take the assignment, or when the assignment requires a large number of officers.[45]   As a result, officers in the Hit-and-Run Unit are inherently exposed to more off-duty opportunities.

B.   Filling the Hit-and-Run Position

According to Officer Breshears, the Hit-and-Run position was all but filled by the time it became available.   To support this theory, Officer Breshears emphasizes various facts precipitating the formal selection process.   For instance, the Captain over all of the Special Operations Divisions at that time was Captain Tanya Washington, an African American.[46]   Long before the Hit-and-Run position became available, Captain Washington announced her general desire to diversify the units

---

[42]   Pl.'s Statement of Undisputed Facts (Doc. 34) ¶ 9.   Despite having never been a member of the Hit-and-Run Unit, Officer Breshears maintains that he worked "every special event this City has ever hosted.   Q: Every single one? A: Every one.   Q: You never missed a special event?   A: I work in some capacity of every special event that's ever been hosted by this City."   Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 23 (39:23-40:4). Outside of these special events, Officer Breshears concedes that he could (and did) work off-duty assignments.   Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 22-23 (36:23-41:13).

[43]   May 20, 2020 Hr'g Tr. at 65:11-16.   According to Officer Breshears's Counsel, "[t]he hit-and-run position, the special ops division, were the ones that were first offered the off-duty jobs. If they choose not to take them, then the regular police officers or those members outside the hit-and-run position would then have the option whether or not they wanted to take those off-duty jobs."   *Id.*

[44]   Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 22-23 (36:23-39:4).

[45]   May 20, 2020 Hr'g Tr. at 65:5-16.

[46]   Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 9.

under her command.[47]  In one instance, Captain Washington expressed her disapproval of the "lily-white" complexion of the units in her division.[48]  She made this statement to a group of lieutenants under her command, two of which ultimately sat on the Hit-and-Run position interview panel.

Additionally, before the interviews for the Hit-and-Run position were conducted, rumors began to circulate that an African American officer named Tauheed Salaam had been pre-selected to fill the vacancy.[49]  On the other hand, Officer Breshears, Lieutenant Whitten, and Officer Salaam all stated in their depositions that they heard rumors that Officer Breshears was a shoo-in for the Hit-and-Run position.[50]  To Officer Breshears's surprise, five days before the Hit-and-Run position was even posted, Officer Salaam approached Officer Breshears and asked if Officer Breshears "would teach him how to do reconstruction."[51]  When Officer Breshears asked why, Officer Salaam responded that "[t]he Lieutenant told [him] as soon as the Hit-And-Run job comes available, its [his]."[52]

When the Hit-and-Run position was finally posted, five candidates applied to fill the

---

[47] Ex. 4 (Whitten Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 85-86 (32:20-33:7).  At her deposition, Captain Washington maintained that the entire Special Operations Division would benefit from more females and more minorities. Ex. 5 (Washington Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 58-59 (56:21-57:10).

[48] Pl.'s Statement of Undisputed Facts (Doc. 34) ¶ 20.  Captain Washington unequivocally denies ever using the term "lily-white." Ex. 5 (Washington Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 84 (82:7-19).  The record reveals that Captain Washington was investigated by Internal Affairs for purportedly using the term "lily-white" when referring to "all white" units within her command.  Ex. 8 (Buckner Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 8-9 (24:13-25:1).  Those allegations were deemed unfounded.  *Id.*  According to LRPD General Order 211, a finding of unfounded means "the allegation was false or not factual or did not occur."  Ex. 9 (General Order 211) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 53 (211-4).  Nonetheless, for the purposes of summary judgment, the Court assumes the statement was made.

[49] Ex. 6 (Bethel Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 150-51 (16:17-17:1), 159 (49:8-50:14).

[50] *See* Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 28 (58:8-59:1); Ex. 4 (Whitten Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 101 (95:20-96:8); Ex. 7 (Salaam Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 285-87 (103:24-105:17).

[51] Pl.'s Statement of Undisputed Facts (Doc. 34) ¶ 19.

[52] *Id.*  Officer Salaam denies ever being told that he would get the job prior to the posting.  Ex. 7 (Salaam Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 224 (42:12-20).

vacancy.[53]   The applicants consisted of two African Americans, two Caucasians, and one Hispanic.[54]  In May 2016, a panel convened to interview the candidates.  The panel was comprised of Sergeant George Bethel, the Hit-and-Run Unit's supervisor; Lieutenant Earnest Whitten, Sergeant Bethel's supervisor; and Lieutenant Nathan Tackett, who was not affiliated with the Hit-and-Run Unit.[55]  The panel was tasked with interviewing the candidates and then recommending the most qualified candidate or candidates to Captain Washington.   From there, the recommendation would pass up the chain of command to Assistant Chief Finks, and then to Chief Buckner.

After the interviews were conducted, the panel unanimously agreed that three of the candidates were qualified to fill the position—Officer Ray Moreno (Hispanic), Officer Salaam (African American), and Officer Breshears (Caucasian).[56]   Sergeant Bethel drafted a memo reflecting the panel's findings.   All of page one and most of page two simply listed the qualifications of all five respective candidates.[57]  The bottom of the second page recommended that any of the three qualified officers could fill the Hit-and-Run position.[58]  This version of the recommendation was submitted to Captain Washington.

It is undisputed that Captain Washington had both the authority and discretion to approve any of the three qualified candidates, including Officer Salaam.[59]  But instead of simply exercising

---

[53]  Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 10.

[54]  *Id.*

[55]  *Id.* ¶¶ 8, 11.

[56]  *Id.* ¶ 12.

[57]  Ex. C (Recommendation Memo) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-3) at 2-3.

[58]  Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶¶ 12-14; *see also* Defs.' Mem. Br. in Supp. of Mot. for Summ. J. (Doc 30) at 10-11.

[59]  Pl.'s Statement of Undisputed Facts (Doc. 34) ¶ 39; Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 23; Ex. 5 (Washington Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 119-20 (117:13-118:15).

her authority, Captain Washington rejected and returned the memo to Sergeant Bethel with instructions to limit the panel's recommendation to Officer Salaam alone.[60]   After brief and unsuccessful attempts to compromise, Sergeant Bethel refused to make Captain Washington's requested modification.[61]   Captain Washington went to Sergeant Bethels's Office, yelled at him, and stormed out.[62]   Lieutenant Whitten then told Sergeant Bethel that Lieutenant Whitten would incorporate the change himself.[63]   Presumably, Lieutenant Whitten did just that.[64]   Indeed, the memo that was ultimately adopted recommended that Officer Salaam fill "the current vacancy in the Hit and Run Office . . . ."[65]

The modified memo proceeded up the chain of command to Assistant Chief Finks, who approved the recommendation in favor of Officer Salaam.[66]   At that point, Chief Buckner had the authority to accept or deny the recommendation in favor of Officer Salaam, or even to select his own candidate for the position.[67]   Although Chief Buckner does not recall the exact level to which he was involved in this particular decision, at the very least, he implicitly approved the recommendation by delegating the decision to Assistant Chief Finks.[68]   It is undisputed that "Chief

---

[60] Pl.'s Statement of Undisputed Facts (Doc. 34) ¶¶ 39-41.  Both Lieutenant Whitten and Captain Washington deny that Captain Washington instructed the panel to recommend Officer Salaam.  Ex. 4 (Whitten Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 89 (46:15-47:8); Ex. 5 (Washington Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 61-62 (59:14-60:2).

[61] Pl.'s Statement of Undisputed Facts (Doc. 34) ¶¶ 40-46.

[62] *Id.* ¶ 47.

[63] *Id.* ¶ 48.

[64] *Id.* ¶¶ 47-48; Ex. 4 (Whitten Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 89 (46:15-47:8).

[65] Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶¶ 13-14.

[66] *Id.* ¶ 19.

[67] *Id.* ¶ 25. Both parties agree that the ultimate decision making authority was not in Captain Washington's hands.

[68] Ex. 8 (Buckner Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 7 (18:7-17), 7 (19:23-20:5), 8 (21:8-19), 9 (25:5-13); Ex. 1 (General Order 202) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 4 (202-3); *see also* Ex. 5 (Washington Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 103-06 (101:15-104:2).

Buckner was not aware of any instance in which race was a factor" in the selection process.[69]

On May 26, 2016, Officer Salaam's transfer was approved.[70]  On June 11, 2016, the transfer took effect.[71]  Sometime after the transfer was final, Officer Breshears filed a racial discrimination complaint with the Equal Employment Opportunity Commission ("EEOC").  On June 7, 2017, the EEOC concluded that there was reasonable cause to believe that Officer Breshears was denied the Hit-and-Run position "because of his race (white)."[72]  Ultimately, however, the Department of Justice declined to file suit on Officer Breshears's behalf.[73]

### C.  The Officer Involved Shooting

On July 19, 2017, Officer Breshears was involved in a critical incident known as an officer involved shooting.  In short, Officer Breshears and another officer responded to a shoplifting report.  After apprehending the suspect and taking him into custody, the suspect broke free from the officers' grip, freed himself from his handcuffs, and fled to a nearby Chick-fil-A.[74]  There, the suspect ran to the drive thru lane, forced a woman out of her vehicle, and then entered the vehicle himself.[75]  When Officer Breshears caught up, the suspect attempted to drive away in the carjacked vehicle.  Officer Breshears maintains that the vehicle turned toward him, and that he feared for his life.[76]  Officer Breshears fired three shots through the vehicle's passenger-side window, hitting the

---

[69]  Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 24.

[70]  *Id.* ¶ 20.

[71]  *Id.*

[72]  Pl.'s Statement of Undisputed Facts (Doc. 34) ¶ 63; Ex. H (EEOC Determination) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-8).

[73]  Ex. A (Right to Sue Letter) to Pl.'s Am. Compl. (Doc. 14-1).

[74]  Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 29; Ex. 15 (Folsom Affidavit) to Defs.' Mot. Summ. J. (Doc. 28-4) at 6-7.

[75]  Pl.'s Statement of Undisputed Facts (Doc. 34) ¶ 31; Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 29.

[76]  Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 45 (125:17-127:4); *see also* Pl.'s Br. in Supp. of

suspect twice.[77]   The record is not clear as to exactly where the original driver of the commandeered vehicle was when the shooting began.

The shooting occurred on a Wednesday.[78]   The following Thursday and Friday, Officer Breshears was off work.[79]   During that time, Officer Breshears qualified at the range and attended an EAP meeting.[80]   Officer Breshears was then off Saturday and Sunday, which was typical of his schedule.[81]   On Monday July 24, 2017, Officer Breshears was placed on administrative leave and returned to work in a restricted capacity.[82]   In accordance with LRPD General Order 303, the LRPD conducted two separate investigations into his shooting.[83]

The LRPD's Major Crimes Division handled the first investigation.   Major Crimes gathered evidence to determine whether Officer Breshears committed any criminal violations for discharging his weapon.[84]   Multiple prosecutors then independently reviewed the LRPD's findings.[85]   At least one prosecutor determined that there was sufficient evidence to charge Officer Breshears with "Battery 3rd Degree."[86]   The Prosecutor's Office sent a memo to the LRPD

---

Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 9.

[77] Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶¶ 28-29; *see also* Ex. 15 (Folsom Affidavit) to Defs.' Mot. for Summ. J. (Doc. 28-4) at 6-7.

[78] Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 39 (103:2).

[79] *Id.* at 39 (103:2-3).

[80] *Id.* "EAP" stands for Employee Assistance Program.   Ex. 10 (General Order 303) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 90 (303-20).   It involves confidential counseling.   *Id.*

[81] Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 39 (103:2-4).

[82] *Id.* at 39 (103:5-14).

[83] Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 30; *see also* Ex. 10 (General Order 303) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 86 (303-16).

[84] Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 31.

[85] *Id.* ¶ 42.

[86] Officer Breshears asserts that the fifth prosecutor was the only prosecutor willing to pursue the criminal charges.   *Compare id.* ¶¶ 33-34, 42, *with* Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 49 (141:5-12), *and* May 20, 2020 Hr'g Tr. at 72:4-10; *see also* Ex. 14 (Prosecutor's Memo) to Defs.' Mot. for Summ. J. (Doc. 28-4) at 5.

informing them of this decision and stating that, if the LRPD would submit an affidavit, charges would be filed.[87]   In response, Sergeant Lela Folsom submitted an affidavit detailing Officer Breshears's shooting incident.[88]   Officer Breshears was charged and tried for Battery Third by the Pulaski County Prosecutor's Office.   He was found not guilty.[89]

The LRPD's Internal Affairs Division conducted the second investigation.   But Officer Breshears never submitted a statement or partook in an interview, rendering the investigation incomplete.[90]   On August 2, 2017, after working eight days in a restricted capacity, Officer Breshears was relieved of active duty.[91]   Relief of active duty is not equivalent to termination. Although Officer Breshears was not allowed to come to work, he was still part of the LRPD.   He recalls a one hour conversation with Chief Fulk, Captain Russel King, and Sargent Cody Miller, where they explained to him that he was being relieved of active duty because "the chief did not like [Officer Breshears's] shooting and it gave them cause for pause."[92]

Later that same day, Officer Breshears saw his primary-care physician, who recommended that he not return to work until August 16 due to medical issues.[93]   On August 15, at a follow up

---

[87]   Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 35; Ex. 14 (Prosecutor's Memo) to Defs.' Mot. for Summ. J. (Doc. 28-4) at 5.

[88]   Ex. 15 (Folsom Affidavit) to Defs.' Mot. for Summ. J. (Doc. 28-4) at 6-7.   Officer Breshears contends that some of the information in the affidavit was misleading.   His contentions are noted and addressed in the section discussing fraud.

[89]   Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 1.

[90]   Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶¶ 36-37; Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc 28-1) at 36 (91:9-13).   *But see* Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 39.

[91]   Officer Breshears's Response to Defendants' Statement of Undisputed Facts says that he was "forced to go on extended leave as a result of a medical condition."   Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 36.   But Officer Breshears also claims that he was relieved of duty prior to seeing his physician.   *Compare* Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 39 (101:2-11), *with id.* at 40 (107:1-19); *see also* Ex. 11 (First Physician Note) to Defs.' Mot. for Summ. J. (Doc. 28-4) at 2.   For the purposes of summary judgment, the Court assumes Officer Breshears's medical appointment came after he was relieved of duty.

[92]   Ex. 3 (Breshears Dep.) to Defs.' Mot Summ. J. (Doc. 28-1) at 41 (109:8-111:12).

[93]   Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 36.

appointment, a second physician recommended that Officer Breshears not return to work indefinitely due to his continuing medical concerns.[94]   Officer Breshears never returned to work for the LRPD.   On December 18, 2017, Officer Breshears submitted his two-weeks' notice.[95]   On December 29, 2017, he officially retired from the LRPD.   After retiring, he filed a second EEOC complaint alleging Defendants retaliated against him for filing his first EEOC complaint.   Officer Breshears received "right to sue" letters for each of his complaints and timely filed suit.[96]

## II.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[97]   The initial burden is on the moving party to demonstrate the absence of a genuine dispute as to any material fact.[98]   The burden then shifts to the nonmoving party to establish that there is some genuine issue to be determined at trial.[99]   The nonmoving party may not rest solely upon the allegations in his pleadings.[100]   To survive summary judgment, the non-moving party "must demonstrate the existence of specific facts" supported by sufficient probative evidence that would permit a favorable finding "on more than mere speculation, conjecture, or fantasy."[101]

The mere existence of a dispute will not bar summary judgment.   The dispute must be genuine, which means the evidence could cause a reasonable jury to return a verdict for either

---

[94]   Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 40-41 (108:1-109:3).

[95]   Ex. 13 (Officer's Letter) to Defs.' Mot. for Summ. J. (Doc. 28-4).

[96]   Exs. A, B (Right to Sue Letters) to Pl.'s Am. Compl. (Docs. 14-1, 14-2).

[97]   FED. R. CIV. P. 56(a).

[98]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[99]   *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997).

[100]   *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).

[101]   *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739 (8th Cir. 2017) (citing *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

party.[102]   And the disputed fact must be material, meaning the resolution of the dispute will be outcome determinative under the controlling law.[103]

### III.  Title VII Discrimination

Officer Breshears's Amended Complaint asserts that he was not selected for the Hit-and-Run position because of his race.  The Eighth Circuit acknowledges that "summary judgment is generally inappropriate in discrimination cases because they are often based on inferences that the fact finder may or may not draw . . . ."[104]  Nonetheless, the Eighth Circuit maintains that there is no "discrimination case exception" to summary judgment.[105]  Summary judgment "remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial."[106]

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."[107]  It is equally unlawful for an employer "to limit, segregate, or classify [its] employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race . . . ."[108]  Although the phrase "adverse employment action" is not found in the language of 42 U.S.C. § 2000e-2(a), courts have long held that a claim

---

[102] *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).

[103] *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

[104] *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir. 1999).

[105] *Id.*

[106] *Id.*

[107] 42 U.S.C. § 2000e-2(a)(1).

[108] *Id.* at (a)(2).

is only actionable under Title VII when a plaintiff suffers adverse employment action.[109]

Defendants assert that Officer Breshears's discrimination claim is fundamentally flawed because Officer Breshears failed to identify any "adverse employment action."[110] Specifically, Defendants contend that Officer Breshears did not suffer adverse employment action because a transfer to the Hit-and-Run Unit is a purely lateral move. Thus, as a threshold matter, the Court must determine whether Officer Breshears suffered adverse employment action as it relates to his discrimination claim.[111]

Adverse employment action is action that "produces a material employment disadvantage."[112] Examples of adverse employment action include "'[t]ermination, cuts in pay or benefits, . . . changes that affect an employee's future career prospects,' or 'circumstances amounting to a constructive discharge.'"[113] On the other hand, "[m]inor changes in duties or working conditions that cause no materially significant disadvantage do not meet the standard of an adverse employment action."[114] The Eighth Circuit has repeatedly held that a "purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action."[115]

Most "lateral transfer" cases depict employees that were transferred *against* their desire.

---

[109] "To bring a cause of action under Title VII, a plaintiff must allege that he has suffered adverse employment action." *Enowmbitang v. Seagate Tech., Inc.*, 148 F.3d 970, 973 (8th Cir. 1998).

[110] Defs.' Mem. Br. Supp. Mot. for Summ. J. (Doc. 30) at 1.

[111] *E.g.*, *Enowmbitang*, 148 F.3d at 973 (considering the existence of "adverse employment action" as a threshold issue).

[112] *In re Kemp*, 894 F.3d 900, 906 (8th Cir. 2018) (quoting *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016 (8th Cir. 1999)).

[113] *Id.*

[114] *Id.*

[115] *Charleston v. McCarthy*, 926 F.3d 982, 990 (8th Cir. 2019) (quoting *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997)).

But the principal developed in those cases logically extends to the case at bar.  Indeed, if the decision to make a purely lateral transfer cannot constitute adverse employment action, neither can the decision *not* to make a purely lateral transfer.  In short, a failure to transfer that would not have resulted in a promotion "in form or substance, cannot rise to the level of a materially adverse employment action."[116]  Although the Eighth Circuit has never expressly adopted this extension, it has affirmed district court decisions that have applied this very rationale.[117]  And, in any event, Officer Breshears agrees that his discrimination claim fails if the Hit-and-Run position was a purely lateral transfer.[118]

Here, it is undisputed that Officer Breshears's rank and pay (from the LRPD) would have remained the same had he received the transfer.  Officer Breshears plainly concedes that the Hit-and-Run position did not constitute a promotion with respect to his rank.[119]  And it is indisputable that the Hit-and-Run position was internally advertised as a "transfer" in accordance with LRPD General Order 202.[120]  Nonetheless, Officer Breshears avers that the Hit-and-Run position was substantively more like a promotion because it was a more "lucrative" position that offered "more opportunities for off-duty or the take-home vehicle and things of that nature."[121]

The potential for a take-home vehicle does not constitute a material change sufficient to

---

[116] *Id.*

[117] *Pulley v. UnitedHealth Grp. Inc.*, 549 F. App'x 591 (8th Cir. 2013) (unreported) (affirming the district court's ruling as a "well-reasoned decision"); *Tyes v. Wilhoit*, 7 F. App'x 538, 539 (8th Cir. 2001) (unreported) (affirming the district court's determination that there was "no adverse employment action by *denial of a lateral transfer* and [plaintiff] thus failed to establish a prima facie case") (emphasis added).

[118] May 20, 2020 Hr'g Tr. at 53:21-54:5.

[119] Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 5; Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 22 (36:8-17).

[120] Ex. 2 (Transfer Memo) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 11; Ex. 1 (General Order 202) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 2-5 (202-1-202-4).  *But see* Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 4.

[121] Ex. A (Breshears Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 22 (36:8-19).

render the Hit-and-Run position akin to a promotion.  In *Charleston v. McCarthy*, a Sergeant in the Polk County Sheriff's Office was transferred from the Patrol Division to the Transport Division.[122]  The plaintiff there argued that the transfer constituted adverse employment action because, among other things, he lost his "patrol vehicle."[123]  The Eighth Circuit disagreed, reasoning that none of the plaintiff's "complained-of-actions" (individually or cumulatively) constituted an adverse employment action.[124]  The same holds true here.  At the hearing, Officer Breshears asserted that the take-home vehicle would have conferred a monetary benefit.  But he provided no evidence on how much money he would have saved had he received a take-home vehicle.  The record is devoid of any evidence relating to the savings he would have experienced on gas, maintenance, or insurance.  Thus, even under the most plaintiff-friendly reading of the facts, the potential for a take-home vehicle does not constitute a material change sufficient to render the failure to transfer an adverse employment action.

Officer Breshears also originally asserted that the Hit-and-Run position was tantamount to a promotion because it would have helped him ascend the LRPD's ranks.[125]  But the only way a patrolman can promote to sergeant is by passing a standardized sergeant's exam.[126]  Officer Breshears only took the sergeant's exam twice in his nearly twenty-seven year career.[127]  He failed each time.[128]  At the summary judgment hearing, Officer Breshears's counsel rephrased his "ascension" argument as one relating to status.  Rather than directly leading to advancement, he

---

[122] *Charleston*, 926 F.3d at 988.

[123] *Id.*

[124] *Id.* at 991.

[125] Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 1.

[126] Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 30 (65:15-66:8); Ex. 5 (Washington Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 24 (22:4-23).

[127] Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 30 (65:15-66:8).

[128] *Id.*

asserted that the prestige associated with the Hit-and-Run position would have incidentally impacted Officer Breshears's potential for promotion. But Officer Breshears failed to point the Court to any evidence in the record supporting this theory. And even if he had, an ambiguous, undefined, and unknowable increase in status that might somehow influence his chance at promotion if, and only if, he first passed the Sergeant's exam cannot constitute a material change sufficient to render the failure to transfer an adverse employment action.

It is true that the Eighth Circuit has recognized "prestige" as a factor for determining whether a lateral transfer was adverse.[129] For example, in *Williams v. Tucker*, the Eighth Circuit held that the transfer in that case may well have been adverse employment action because the transfer position was held by "many more deputy sheriffs and was less prestigious."[130] Similarly, in *Tadlock v. Powell*, the Eighth Circuit determined that the district court's finding of adverse employment action was not clearly erroneous because the evidence established that the transfer position was more saturated and therefore less prestigious than the plaintiff's previous position.[131]

Officer Breshears, however, failed to point to any evidence supporting his assertion that the Hit-and-Run position was more prestigious than his previous position as a Field Training Officer. And the Court "will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments."[132] Unlike *Williams* and *Tadlock*, the record here does not even reveal how many officers held Officer Breshears's previous position as a Field Training Officer.[133] The Court, therefore, can only speculate as to whether the Hit-and-Run position was a

---

[129] *Williams v. Tucker*, 857 F.3d 765, 769 (8th Cir. 2017) (citing *Tadlock v. Powell*, 291 F.3d 541, 547 (8th Cir. 2002)).

[130] *Id.*

[131] *Tadlock*, 291 F.3d at 547.

[132] *Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006).

[133] Officer Salaam notes in his deposition that there were three FTO's in the LRPD when he graduated from recruit school in 1998. Ex. 7 (Salaam Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 196-97 (14:2-15:20). There is no evidence suggesting that this number is at all representative of the number of FTO's in the LRPD nearly 20 years

more prestigious position.  And speculation doesn't get a plaintiff over the summary judgment hump.

That leaves the potential for extra income associated with special events and off-duty assignments.  As discussed in the fact section, the record is clear that Officer Breshears had the opportunity to work any and every special event.  There is no evidence that Hit-and-Run officers got opportunities to work special events while other officers could not.  And it is undisputed that the need for officers at special events was great enough that any officer desiring to do so could work any special event.

Putting special events aside, it is true that Hit-and-Run officers, as part of the Special Operations Division, have the first opportunity for off-duty work.  And it is also true that off-duty work yields additional money.  But the additional money does not come from the LRPD, and therefore should not be considered additional pay attributable to the employer-employee relationship.[134]  Rather, private entities pay (directly or indirectly) for off-duty officers.  Thus, it is up to the contracting entity to decide when and to what extent they need off-duty officers.  In other words, the Hit-and-Run Unit simply affords its officers the first opportunity to volunteer for off-duty work.  But standing at the front of the line, without more, confers no real benefit.  The officer must still volunteer for the assignment in order to capitalize on his position,[135] which would have been no guarantee with Officer Breshears.  Indeed, even when off-duty work was available

---

later, when Officer Breshears was an FTO.  But even assuming there were three FTO's at that time, Officer Breshears's counsel made clear at the hearing that his status-argument relates more broadly to a Hit-and-Run officer's "special ops" designation.  May 20, 2020 Hr'g Tr. at 57:12-15.  Outside of the Hit-and-Run Unit, the Special Operation's Division includes a Motorcycle Unit, an Airport Unit, a SWAT Unit, and a School Resource Unit.  Ex. 6 (Bethel Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 158 (47:11-20).  Thus, although there were only two Hit-and-Run patrol officers, there were many more than three officers that held a "special ops" designation.

[134] Ex. 7 (Salaam Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 270-71 (88:20-89:3).

[135] A Hit-and-Run officer "would have the ability to work off-duty as much or as little as he wanted."  May 20, 2020 Hr'g Tr. at 60:25-61:1.

to him, Officer Breshears openly admits that he avoided certain kinds of available off-duty assignments.[136]  And of course, Officer Breshears had his own private civil accident reconstruction business to tend to.

Even assuming Officer Breshears would have fully capitalized on his opportunities had he been selected for the Hit-and-Run position, he failed to demonstrate the significance of that benefit. Instead, Officer Breshears's testimony revealed that off-duty work—and thus additional money— was readily within his reach despite not being a part of the Hit-and-Run Unit.[137]  Officer Breshears failed to establish the number of additional off-duty assignments he would have had the opportunity to work, and he failed to calculate how much additional income he could have earned had he been selected for the Hit-and-Run position.

These evidentiary omissions are especially problematic in light of Officer Salaam's testimony regarding the Hit-and-Run position.   Indeed, contrary to Officer Breshears's unsupported assertions, the evidence in the record does not indicate that Hit-and-Run officers were disproportionately augmenting their income with off-duty assignments.   For example, Officer Salaam expressly states that his salary did not increase when he transferred to the Hit-and-Run Unit.[138]  He further states that he was working "somewhere between . . . 275 to 300 . . . hit and runs a month" at the time of his deposition, as well as supervising "20 crossing guards."[139]  That's an average of more than fourteen hit and runs a day, five days a week.  On top of those weekly duties, the record reveals that Hit-and-Run officers coordinate between 60 and 70 special events a

---

[136] Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 23 (37:10-18).

[137] Officer Breshears concedes that he could (and did) work off-duty assignments. *Id.* at 22-24 (36:23-41:13).  He also vaunts the fact that he worked "every special event this City has ever hosted.  Q: Every single one?  A: Every one.  Q: You never missed a special event?  A: I work in some capacity of every special event that's ever been hosted by this City."  *Id.* at 23 (39:21-40:4); *see also* Pl.'s Statement of Undisputed Facts (Doc. 34) ¶ 9.

[138] Ex. 7 (Salaam Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 270-71 (88:20-89:3).

[139] *Id.* at 259 (77:18-25), 251-52 (69:24-70:14).

year, and work special events roughly "29 weekends out of the 52 in the year."[140]   Officer

Breshears presented no evidence to reconcile the actual demands of the Hit-and-Run position with

his claim of seemingly unbridled opportunities for off-duty work.[141]

As discussed above, "[i]t [i]s not the District Court's responsibility to sift through the

record to see if, perhaps, there [i]s an issue of fact."[142]   Rather, it is incumbent upon the nonmoving

to "demonstrate the existence of specific facts" supported by sufficient probative evidence that

would permit a favorable finding "on more than mere speculation, conjecture, or fantasy."[143]

Officer Breshears failed to support his conclusory assertions with evidence in the record.   As a

result, the Court can only speculate as to whether the increased opportunity to for off-duty work is

concrete or significant enough to render the transfer a promotion.   Speculation is not enough to

pass summary judgment.

In light of the foregoing discussion, the Court concludes that there is no evidence that can

lead a rational jury to find that the Hit-and-Run position was anything other than a purely lateral

transfer.   Officer Breshears did not present "specific facts" supported by sufficient probative

evidence that would permit a favorable finding "on more than mere speculation, conjecture, or

---

[140] Ex. 6 (Bethel Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 163-64 (68:21-69:11); *see also* Ex. 6 to Ex. 7 (Salaam Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 311.   According to Lieutenant Whitten, Hit-and-Run officers worked "over 200-plus [special events] a year."   Ex. 4 (Whitten Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 87 (38:10-39:1).   Once again, the majority of special events are paid as overtime and are therefore precluded from the off-duty analysis.   This is significant, as it suggests that over half of a typical Hit-and-Run officer's weekends are *not* spent working off-duty.

[141] According to Officer Salaam, "in a position like Special Events . . . you are always busy and you need to be at work."   Ex. 7 (Salaam Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-2) at 139 (137:11-15).   At the hearing, however, Officer Breshears's counsel claimed that, in the Hit-and-Run position, Officer Breshears "would have the ability to work off-duty as much or as little as he wanted."   May 20, 2020 Hr'g Tr. at 60:25-61:1.   Defendants' counsel disagreed, explaining that the LRPD imposes a 20-hour-a-week cap on off-duty work for all officers, including Hit-and-Run officers.   *Id.* at 18:15-20.   But this information was not contained in the record.

[142] *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009).

[143] *Donathan*, 861 F.3d at 739 (citing *Yarnell*, 497 F.3d at 825); *see also Anderson*, 477 U.S. at 255.

fantasy."[144]   Because the Hit-and-Run position did not constitute a promotion in form and

substance, Defendants are entitled to judgment as a matter of law on the discrimination claim.

## IV.  Title VII Retaliation

Officer Breshears's Amended Complaint asserts that Defendants retaliated against him for

pursuing his racial discrimination claim with the EEOC.  Specifically, he asserts that Defendants

subjected him to disciplinary actions, placed him on an extended administrative leave, relieved

him of duty, and pressed criminal charges against him all in retaliation for filing his EEOC

complaint.[145]   Under Title VII, it is unlawful for an employer to discriminate against an employee

who opposes an unlawful employment practice or who charges or participates in a discrimination

investigation or proceeding against his employer.[146]   To survive summary judgment, a plaintiff

must either (1) establish admissible evidence directly indicating unlawful retaliation or (2) create

an inference of unlawful retaliation under the burden shifting framework set forth in *McDonnell

Douglas*.[147]

Defendants assert that Officer Breshears failed to show any direct evidence of retaliation.

The Court agrees.  Accordingly, Officer Breshears must create an inference of retaliation under

the *McDonnell Douglas* framework.[148]   Three steps are required: (1) the plaintiff must establish a

*prima facie* case of retaliation; (2) the burden then shifts to the employer to show a legitimate

nondiscriminatory reason for its conduct; and, if the employer produces such evidence, (3) the

---

[144] *Id.*

[145] Pl.'s Am. Comp. (Doc. 14) ¶¶ 18-26.

[146] 42 U.S.C. § 2000e-3(a).

[147] *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 805 (8th Cir. 2019).

[148] *Id.*

burden shifts back to the plaintiff to show that the proffered reason was merely pretextual.[149]

A. Step One – *Prima Facie* Case

A *prima facie* case of retaliation is established if the plaintiff shows (1) that he engaged in protected activity, (2) a reasonable employee would have found the retaliatory conduct materially adverse, and (3) the materially adverse conduct was causally linked to the protected activity.[150] The first element is met. Officer Breshears clearly engaged in protected activity when he filed his initial EEOC complaint alleging racial discrimination. The second element is also met. Indeed, Officer Breshears contends that he was "subjected to disciplinary actions, placed on an extended administrative leave, relieved of duty status, and had criminal charges filed against him as part of the retaliation efforts by the Defendants . . . ."[151] A reasonable employee would find this conduct materially adverse.

The Court does not think that Officer Breshears has satisfied the causal connection element of a *prima facie* case of retaliation. The Eighth Circuit has been clear that the causal connection element "may be severed by the passage of a significant amount of time, or by some legitimate

---

[149] *Id.* at 805.

[150] *Id.*

[151] Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 8. Officer Breshears's Response to Defendants' Motion for Summary Judgment introduces for the first time the claim that he was told that "at the end of the Internal Affairs investigation . . . he was going to be terminated." *Id.* at 4. Officer Breshears believes that this statement was made by the president of the Fraternal Order of Police ("FOP"). Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc 28-1) at 33 (78:16-22). The FOP is not part of the LRPD or the City of Little Rock. *Id.* at 33 (79:2-5), 48 (137:6-19). It is a separate organization that has no authority to terminate police officers. *Id.* at 34 (82:2-9, 83:7-12), 48 (137:6-19). As such, statements from the FOP are not attributable to the LRPD.

Even if the Court considered Officer Breshears's contention that the president of the FOP told him he would be fired at the end of the internal investigation, Officer Breshears failed to present any facts beyond temporal proximity to suggest that the statements regarding termination were improperly motivated. To the contrary, the record reveals that Internal Affairs sustained two misconduct charges against Officer Breshears following its investigation. Pl.'s Resp. to Defs.' Statement of Material Fact (Doc. 33) ¶¶ 37, 39; *see also* Ex. 8 (Buckner Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 18 (61:3-15).

intervening event."[152]  Both are at play here.  All of the specific retaliatory acts alleged in Officer

Breshears's Amended Complaint relate to events that transpired nearly a year after Officer

Breshears filed his initial EEOC complaint, and more than a month after the EEOC rendered its

"reasonable cause" determination.[153]  At the summary judgment hearing, the Court expressly asked

whether there was any retaliation prior to the shooting incident.  Officer Breshears's counsel stated

that he did not know "of any retaliation from the time [Officer Breshears] filed his complaint until

the [EEOC's] finding," nor did he know of any retaliation between the issuance of the EEOC's

finding and the shooting incident.[154]

Nevertheless, Officer Breshears contends that the Court should refer to the date the EEOC

rendered its "reasonable cause" determination in considering the degree of temporal connection.[155]

Even under this timeline, the temporal connection is tenuous, at best.[156]  Moreover, Officer

Breshears's controversial shooting incident is a legitimate intervening cause sufficient to break

any remaining causal-connection fibers.  And, as seen below, the shooting also gives rise to the

existence of non-retaliatory motives, further undermining Officer Breshears's reliance on temporal

proximity.  Indeed, the Eighth Circuit recognizes that a *prima facie* retaliation case "built on

temporal proximity[] is undermined where the allegedly retaliatory motive coincides temporally

with the non-retaliatory motive."[157]

---

[152] *E.g.*, *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969 (8th Cir. 2017) (quoting *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014)).

[153] Pl.'s Am. Comp. (Doc. 14) ¶¶ 18-26.

[154] May 20, 2020 Hr'g Tr. at 68:24-69:14.

[155] Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 1.

[156] *Arraleh v. Cty. of Ramsey*, 461 F.3d 967, 977-78 (8th Cir. 2006) (holding that three weeks between the plaintiff's protected activity and his failure to receive a permanent position "may suffice" to show causation for a *prima facie* case, but was not enough to show pretext); *see also Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1113 (8th Cir. 2001) (holding that "a matter of weeks" was proximate enough to meet the "bare minimum" of a *prima facie* case, but not enough to establish pretext).

[157] *Gibson v. Concrete Equip. Co., Inc.*, No. 18-3009, 2020 WL 2892226, at *5 (8th Cir. June 3, 2020) (quoting

The Court therefore concludes that the passage of time, in conjunction with the shooting incident, breaks any causal connection that existed between Officer Breshears's protected activity and the alleged retaliation.  Officer Breshears failed to establish a *prima facie* case of retaliation. Nevertheless, out of an extreme abundance of caution, the Court will continue to the second step of the *McDonell Douglas* analysis.

B. Step Two – Nondiscriminatory Reasons

Defendants advance multiple nondiscriminatory reasons for their conduct.  Specifically, Defendants assert that Officer Breshears was subject to disciplinary action, placed on administrative leave, and ultimately relieved of duty all in accordance with standard protocol following an officer involved shooting.[158]  According to LRPD General Order 303, "[d]ischarging firearms at a moving or fleeing vehicle is *prohibited*, unless it is necessary to prevent imminent death or serious physical injury."[159]  Rather than move entirely out of the vehicle's path as required by General Order 303, Officer Breshears fired three times into the passenger-side widow of a moving vehicle, hitting the suspect twice.[160]

As a result of his actions, and pursuant to department policy, Officer Breshears was subject to two separate investigations—a criminal investigation and an administrative investigation.[161] This was standard protocol.  He was also immediately placed on administrative leave in accordance

---

*Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 1001 (8th Cir. 2011).

[158] Defs.' Mem. Br. Supp. Mot. for Summ. J. (Doc. 30) at 13; Ex. 9 (General Order 211) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 52 (211-3); Ex. 10 (General Order 303) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 86 (303-16).

[159] Ex. 10 (General Order 303) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 72 (303-2) (emphasis added).

[160] *Id.*

[161] *Id.* at 86 (303-16). LRPD General Order 211 states that Internal Affairs is responsible for investigating *all* officer involved shootings and the use of deadly force.  Ex. 9 (General Order 211) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 52 (211-3).  Order 303 mandates a criminal investigation into *all* officer involved shootings.  Ex. 10 (General Order 303) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 86 (303-16).

with standard procedure.  Indeed, LRPD General Order 303 states that "[o]fficers who have employed Deadly Force, which has resulted in injury . . . will be placed on Administrative Leave until after the officer has attended mandatory EAP sessions, a thorough administrative review has been completed or a decision by the Chief . . . has been made to return to work."[162]  Administrative leave may be extended at the discretion of the appropriate division commander.[163]  Although Officer Breshears did partake in at least one EAP meeting, he did not fully participate in the internal affairs investigation, rendering the administrative review incomplete.[164]  When the investigation was finally closed, it was determined that Officer Breshears "breached two policy violations regarding officer involved shootings . . . ."[165]

With respect to relief of duty, LRPD General Order 211 states that if a misconduct "violation is of a serious nature, the investigating supervisor *shall* relieve the employee of duty and take his/her credentials, issued weapon, radio and badge."[166]  The record contains no evidence undermining the LRPD's finding that Officer Breshears violated department policy regarding the use of deadly force when he fired three rounds into a vehicle as it attempted to pull out of a Chick-fil-A drive thru.  Defendants have sufficiently demonstrated nondiscriminatory reasons for subjecting Officer Breshears to two investigations, for placing him on administrative leave, and for relieving him of duty.

Finally, as it relates to his criminal prosecution, LRPD General Order 303 states that "a

---

[162] Ex. 10 (General Order 303) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 90 (303-20).

[163] *Id.* at 91 (303-21).

[164] Pl.'s Resp. to Defs.' Statement of Material Fact (Doc. 33) ¶¶ 37, 39.

[165] *Id.*

[166] Ex. 9 (General Order 211) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 52 (211-3) (emphasis added).  Defendants also note that, given Officer Breshears's health concerns and his physicians' instructions, Officer Breshears could not have worked at this time even if he wanted to.  *See* Ex. 11 (First Physician Note) to Defs.' Mot. for Summ. J. (Doc. 28-4) at 2; Ex. 12 (Second Physician Note) to Defs.' Mot. for Summ. J. (Doc. 28-4) at 3; Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 40-41 (108:6-109:3).

copy of the investigative file will be forwarded to the Office of the Chief of Police for review before forwarding to the Prosecuting Attorney's Office."[167]  It is undisputed that "Chief Buckner did not believe he had the authority to determine which criminal investigation files were sent to the prosecutor's office for review and which were not when dealing with officer involved shootings."[168]  It is equally undisputed that the ultimate decision to prosecute was made by the Pulaski County Prosecutor's Office, not Chief Buckner or the City of Little Rock.  Defendants have therefore successfully identified legitimate nondiscriminatory reasons for each of the acts that Officer Breshears alleges were retaliatory.

## C. Step Three – Pretext

"On a 'fully developed summary judgment record,' the plaintiff's obligation to demonstrate pretext 'merges' with the requirement to show that 'an impermissible retaliatory motive was the "but-for cause" of the adverse employment action.'"[169]  In other words, the plaintiff must show that the alleged harm would not have occurred in the absence of impermissible retaliation.[170]  Although temporal proximity can establish a *prima facie* case of retaliation, a plaintiff must present more than just a temporal connection to establish a genuine issue of material fact.[171]

Officer Breshears contends that Defendants' reasons are pretextual because the LRPD treated other officer involved shootings differently than his own.  He maintains that he is "the only

---

[167] Ex. 10 (General Order 303) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 89 (303-19).

[168] Pl.'s Resp. to Defs.' Statement of Material Fact (Doc. 33) ¶ 32.

[169] *Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1137 (8th Cir. 2020) (quoting *Donathan*, 861 F.3d at 739-40); *see also Babb v. Wilkie*, 140 S. Ct. 1168, 1176 (2020) (reaffirming its interpretation of Title VII's anti-retaliation provision as "requiring retaliation to be a but-for cause of the end result of the employment decision.").

[170] *Babb*, 140 S. Ct. at 1176.

[171] *Arraleh*, 461 F.3d at 977; *see also Sprenger*, 253 F.3d at 1114 (stating that courts should look "for proximity in conjunction with other evidence" when making an ultimate finding on pretext or discrimination).

person that he [is] aware of who was not placed back on patrol while there was still an investigation pending."[172]   But Officer Breshears has presented no evidence to establish that what he is "aware of" is representative of reality.   During his deposition, Officer Breshears made vague references to other officer involved shootings during Chief Buckner's tenure.[173]   But Officer Breshears's testimony provides little more than the officers' names, occasional stray facts, and his belief that these officers returned to normal duty shortly after a shooting incident.[174]   He neglected to present any documentation or concrete evidence to support his assertions.[175]   Officer Breshears's uncorroborated belief that other officers were treated differently than him does not constitute sufficient probative evidence that would permit a favorable finding "on more than mere speculation, conjecture, or fantasy."[176]

Even assuming his contentions are true, they do not create a genuine issue of material fact. This is because Officer Breshears has presented little to no evidence to suggest that his treatment, given the particular circumstances of his shooting, was unwarranted or improperly motivated. Indeed, at the very most, Officer Breshears has demonstrated that the LRPD used a sterner hand in dealing with his shooting incident in comparison to other officer shootings.   But differential treatment, in and of itself, is not evidence of retaliation or pretext.   Without demonstrating the

---

[172] Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 8; Pl.'s Statement of Undisputed Facts (Doc. 34) ¶ 26.

[173] Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 39-40 (104:1-106:7); *see also* Pl.'s Statement of Undisputed Facts (Doc. 34) ¶ 26-29.   Officer Breshears identified the following officers by name: Calvin Snow, Jonathan Gonzalez, Zach Farley, Stephen Lichti, Brittany Gunn and Angela Everett.   Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 39-40 (104:1-106:7).   Although Officer Breshears stated that he had a list of names and access to all of the relevant officers' files, he did not provide that information to the Court.   *Id.*   Chief Buckner was also questioned about a list of officers that used deadly force during his tenure as Chief.   Ex. 8 (Buckner Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-3) at 19 (65:2-67:10).   That line of questioning does not reveal any facts that support Officer Breshears's blanket assertions regarding administrative leave.

[174] Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 39-40 (104:1-106:7).

[175] *Id.* (referring to a list of officer-involved shootings).

[176] *Donathan*, 861 F.3d at 739 (citing *Yarnell*, 497 F.3d at 825).

factual similarity of his shooting to other officer shootings, the fact that Officer Breshears's case was treated differently means very little.  Officer Breshears largely failed to inform the Court of the circumstances of the other shootings, the parties involved and their respective mental states, or anything else that would suggest that his shooting warranted the same response as any other officer shooting.[177]  Consequently, Officer Breshears has failed to identify a genuine issue of material fact as to pretext.  Defendants are therefore entitled to judgment as a matter of law on Officer Breshears's retaliation claim.

## V.  Fraud

Officer Breshears alleges that Defendants engaged in fraud under Arkansas law.  His Amended Complaint states that Captain Washington instructed Lieutenant Whitten to have Sergeant Bethel modify his memo "to reflect that Tauheed Salaam was the only officer being recommended" for the Hit-and-Run position.[178]  Although Sergeant Bethel refused to make this change, the memo was ultimately revised to reflect Captain Washington's demand.  Officer Breshears reasons that, in light of Sergeant Bethel's refusal, the changes made to the memo must have been the product of fraud and deception.  To prove fraud, a plaintiff must establish the following five elements:

> 1) that the defendant made a false representation of material fact; (2) that the defendant knew that the representation was false or that there was insufficient evidence upon which to make the representation; (3) that the defendant intended to induce action or inaction by the plaintiff in reliance upon the representation; (4) that the plaintiff justifiably relied on the representation; and (5) that the

---

[177] Once again, although Officer Breshears stated in his deposition testimony that he had a list of names and access to all of the relevant officers' files, he did not provide that information to the Court.  Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 39-40 (104:1-106:7).

[178] Pl.'s Am. Compl. (Doc. 14) ¶¶ 27-28.

plaintiff suffered damage as a result of the false representation.[179]

Defendants argue that Officer Breshears failed to present any evidence that the City of Little Rock or Chief Buckner "had any belief or knowledge that the memorandum for selection of the Hit and Run investigation position was forged or fraudulent in any fashion." [180]  Defendants further assert that "there was no intent or justifiable reliance for the Plaintiff as the memorandum in question was *not for the Plaintiff or even to be seen by the Plaintiff* . . . ." [181]  Accordingly, Defendants contend that Officer Breshears lacks standing to even assert a fraud claim. [182]

Officer Breshears neglected to respond to any of Defendants' arguments on this point.[183] As a result, Officer Breshears has failed to identify a genuine issue of material fact with respect to any of the elements of fraud.  That's not surprising, given that it is indisputable that the memo was not for Officer Breshears or even meant to be seen or read by him.  Defendants are therefore entitled to judgment as a matter of law on this issue.

## VI.  Other State Causes of Action

Officer Breshears's Amended Complaint alleges the following state torts: 1) false imprisonment; 2) false arrest; 3) malicious prosecution; 4) abuse of process; and 5) liable/slander.[184]  Defendants assert that these state law claims should all be dismissed because Officer Breshears was arrested and imprisoned pursuant to a warrant that was based on probable

---

[179] *Muccio v. Hunt*, 2016 Ark. 178, 4–5, 490 S.W.3d 310, 312–13.

[180] Defs.' Mem. Br. Supp. Mot. for Summ. J. (Doc. 30) at 16.

[181] *Id.* (emphasis added).

[182] *Id.*

[183] Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 9-12.

[184] Pl.'s Am. Compl. (Doc. 14) ¶¶ 30-31.

cause and issued by a neutral judge.[185]

According to Officer Breshears, his false imprisonment and false arrest claims hinge entirely on the success of his malicious prosecution claim.  His Response to Defendants' Motion for Summary Judgment simply argues that "[o]nce it is determined that the Defendants' actions in pursuing a criminal case were malicious, the additional torts of false imprisonment and false arrest fall into place."[186]   To establish malicious prosecution under Arkansas law, a plaintiff must establish the following five elements: (1) a proceeding was instituted or continued by the defendant against the plaintiff; (2) the proceeding was terminated in favor of the plaintiff; (3) absence of probable cause for the proceeding; (4) malice on the part of the defendant; and (5) damages.[187] Defendants argue that Officer Breshears failed to establish the first element because his prosecution was instituted and continued by the Pulaski County Prosecutor's Office, not by the City of Little Rock or Chief Buckner.[188]

The Arkansas Supreme Court's position on this issue "is consistent with comment g" to section 653 of the Restatement (Second) of Torts.[189]   Generally, when a prosecutor exercises his uncontrolled discretion to initiate a proceeding, the exercise of his discretion "makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the [prosecutor] to initiate the proceedings."[190]   But an exception to the rule applies when the information provided to the prosecutor "is known by the giver to be false."[191]   In that situation,

---

[185] Defs.' Mem. Br. Supp. Mot. for Summ. J. (Doc 30) at 17.

[186] Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 11.

[187] *McMullen v. McHughes Law Firm*, 2015 Ark. 15, 15, 454 S.W.3d 200, 210.

[188] Defs.' Mem. Br. in Supp. of Mot. for Summ. J. (Doc. 30) at 17 (citing Ark. Code Ann. § 16-21-103).

[189] *S. Ark. Petroleum Co. v. Schiesser*, 343 Ark. 492, 496, 36 S.W.3d 317, 320 (2001).

[190] Restatement (Second) of Torts § 653 cmt. g (1977).

[191] *Id.*

"an intelligent exercise of the [prosecutor's] discretion becomes impossible, and a prosecution based upon it is procured by the person giving the false information."[192]

Defendants assert that the general rule applies.  They contend that the Prosecutor's Office necessarily exercised its discretion in charging Officer Breshears because, by law, it is exclusively the duty of prosecuting attorney to "*commence* and *prosecute* all criminal actions . . . ."[193]  Defendants further note that it is undisputed that five prosecuting attorneys reviewed Officer Breshears's case file.[194]  Based on their independent review, at least one of the reviewing attorneys determined that charges could be filed.[195]  And a neutral judge found probable cause to issue an arrest warrant for Officer Breshears.[196]

Officer Breshears asserts that "[t]here is no doubt that this proceeding was initiated by the Defendants against the Plaintiff by the filing of an Affidavit."[197]  He further asserts that Defendants should not be able to insulate themselves from liability because Sergeant Folsom's affidavit of arrest contained information Defendants knew to be inaccurate, misleading, and "grossly ambiguous."[198]  Because the Prosecutor's Office acted in reliance on Sergeant Folsom's affidavit, Officer Breshears contends that the exception to the general rule applies and that Defendants remain liable.

Officer Breshears's argument is misplaced for multiple reasons.  First, the exception Officer Breshears relies upon applies to *private individuals* that supply information to public

---

[192] *Id.*

[193] Ark. Code Ann. § 16-21-103 (emphasis added).

[194] Pl.'s Resp. to Defs.' Statement of Undisputed Facts (Doc. 33) ¶ 33; Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 48-49 (140:25-141:9).

[195] Ex. 3 (Breshears Dep.) to Defs.' Mot. for Summ. J. (Doc. 28-1) at 49 (141:10-141:13).

[196] *Id.* at 48 (139:7-14).

[197] Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 9.

[198] *Id.* at 10.

officials who are *ignorant* of the purported crime.[199]   Sergeant Folsom's affidavit was only sent *after* multiple prosecutors reviewed the case file.[200]   In fact, it was the Prosecutor's Office that prompted the LRPD to send the affidavit, further evidencing its familiarity with the case and its independent decision to prosecute.[201]

Second, Officer Breshears's primary contention with the affidavit's accuracy revolves around the recommendation that he be charged with a crime of negligence.   He asserts that his actions "could not be construed as anything other than intentionally causing physical injury to another person," and that pursing battery third degree "was an inexcusable abuse by Defendants."[202]   Once again, Officer Breshears is off base.   The recommended charge is not a fact that can be falsified; it is a suggestion.   Moreover, the suggestion that Officer Breshears be charged with battery third degree originated, not with Sergeant Folsom, but with the Prosecutor's Office.[203]   Sergeant Folsom's affidavit merely adopted the charge identified by the Prosecutor's Office in its memorandum to the LRPD.   Thus, to the extent it could be construed as false information, it cannot be said to have misled or induced the Prosecutor's Office to act.

Officer Breshears also contends that the affidavit failed to identify the victim of his alleged crime.   The memo from the Prosecutor's Office indicated that the victim was the shoplifting suspect, Rudy Availa.[204]   Sergeant Folsom's affidavit, however, does not expressly state who the ultimate victim was, although it does identify the woman who was pulled out of her car as a

---

[199] Restatement (Second) of Torts § 653 cmt. g (1977).

[200] Ex. 14 (Prosecutor's Memo) to Defs.' Mot. for Summ. J. (Doc. 28-4) at 5; Ex. 15 (Folsom Affidavit) to Defs.' Mot. for Summ. J. (Doc. 28-4) at 6.

[201] Ex. 14 (Prosecutor's Memo) to Defs.' Mot. for Summ. J. (Doc. 28-4) at 5.

[202] Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 10.

[203] Ex. 14 (Prosecutor's Memo) to Defs.' Mot. for Summ. J. (Doc. 28-4) at 5.

[204] *Id.*

"female victim."[205]  While this may appear inconsistent, or even produce an ambiguity regarding the victim of Officer Breshears's alleged crime, the lack of clarity does not render any facts in the affidavit intentionally falsified.  Nor does it change the fact that the Prosecutor's Office was well acquainted with the facts of this case prior to receiving the affidavit.

In light of the undisputed facts, the Court concludes that the exception advanced by Officer Breshears has no application in this case.  The Court further concludes that the Pulaski County Prosecutor's Office initiated and continued Officer Breshears's prosecution, not Chief Buckner or the City of Little Rock.  Because there are no genuine disputes of material fact on this point, Defendants are entitled to judgment as a matter of law on Officer Breshears's malicious prosecution claim.  And because Officer Breshears's Response staked the success of his false imprisonment and false arrest claims on the success of his malicious prosecution claim, those arguments fall flat.  Defendants are therefore entitled to summary judgment on those claims as well.

Officer Breshears's Amended Complaint also asserts a claim for abuse of process.[206] Where malicious prosecution focuses on impropriety surrounding the initiation of a judicial action, abuse of process concerns the judicial process in motion.[207]  A plaintiff must establish: (1) a legal procedure set in motion in proper form; (2) the procedure is perverted to accomplish an ulterior purpose for which it was not designed; and (3) a willful act is perpetrated in the use of process which is not proper in the regular conduct of the proceeding.[208]  Fundamentally, the question is

---

[205] Ex. 15 (Folsom Affidavit) to Defs.' Mot. for Summ. J. (Doc. 28-4) at 6.

[206] At the hearing, Officer Breshears renounced this claim. *See* May 20, 2020 Hr'g Tr. at 73:2-8.

[207] *Schiesser*, 343 Ark. at 502, 36 S.W.3d at 323.

[208] *Id.* at 501 (citing *Routh Wrecker Serv., Inc. v. Washington*, 335 Ark. 232, 238, 980 S.W.2d 240, 243 (1998)).

whether the "judicial prosess is used to extort or coerce."[209]

Defendants contend that Officer Breshears's criminal prosecution was both instituted and prosecuted legitimately.  They argue that Officer Breshears failed to show any ulterior purpose or abuse on the part of the prosecution or Defendants.  The Court agrees.  Officer Breshears conclusively asserts the following response: "A review of the Plaintiff's Statement of Undisputed Material Facts and attached Exhibits clearly demonstrates that the Defendants were not trying to bring Officer Breshears to justice but instead to embarrass and humiliate him."[210]  This overly broad reference to the entire body of evidence does not create a genuine dispute of material fact.  Defendants are entitled to judgment as a matter of law.

Finally, Defendants assert that Officer Breshears "made no factual allegations of liable/slander and therefore this claim should be dismissed."[211]  Officer Breshears's Response made no attempt to salvage his liable/slander claim.  In fact, he failed to even recognize it as one of his "pendent state law causes of action" in his Brief in Support of Response to Motion for Summary Judgment.[212]  Accordingly, the Court grants Defendants' Motion for Summary Judgment with respect to Officer Breshears's liable/slander claim.

## VII.  Conclusion

In accordance with the foregoing explanation, the Court GRANTS Defendants' Motion for Summary Judgment in its entirety.  Judgment shall be entered in favor of Defendants on all claims.

IT IS SO ORDERED this 25th day of June 2020.

---

[209] *Id.*

[210] Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 12.

[211] Defs.' Mem. Br. in Supp. of Mot. for Summ. J. (Doc. 30) at 18.

[212] Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. 32) at 9.

LEE P. RUDOFSKY
UNITED STATES DISTRICT COURT